Optimal Strategic U.S. Equity Ltd., Plaintiff,

against
SPV OSUS Ltd., Defendant.


653693/2014

Hunton & Williams LLP, New York City (Shawn Patrick Regan, Joseph J. Saltarelli, Samuel A. Danon, and Gustavo J. Membiela) and Smith, Buss & Jacobs, LLP, Yonkers, New York (John J. Malley) for plaintiff Optimal Strategic U.S. Equity Ltd.
Yetter Coleman LLP, Houston, Texas (R. Paul Yetter, Collin J. Cox, James E. Zucker, Autry W. Ross, and Elizabeth A. Wyman) and Law Office of Matthew C. Heerde, New York City (Matthew C. Heerde) for defendant SPV OSUS Ltd.


Saliann Scarpulla, J.

Motion sequence nos. 007 and 008 are consolidated for disposition. In motion sequence no. 007, plaintiff Optimal Strategic U.S. Equity Ltd. ("OSUS") moves, pursuant to CPLR 3212, for summary judgment on its claim for a declaration of the rights of the parties pursuant to a written assignment of claim the ("Assignment of Claim") dated May 6, 2011. Defendant SPV OSUS Ltd. ("SPV") also moves (seq. no. 008) for summary judgment in its favor.
Several years after the execution of the Assignment of Claim, a dispute arose between the parties regarding the scope of the rights that OSUS assigned to SPV. The sole issue before me is whether, in assigning to SPV its allowed claim in the liquidation proceeding of Bernard L. Madoff Investment Securities, LLC ("BLMIS") OSUS also assigned to SPV the right to sue certain third parties, such as OSUS's service providers. Both sides argue that the language of the assignment is unambiguous, rendering the matter ripe for summary judgment.
Background
OSUS is a trading company owned by Optimal Multiadvisors, Ltd. ("OML"), which is a Bahamian multi-portfolio investment company. All of OML's shares are [*2]owned by Optimal Investment Services, S.A. ("OIS"), a Swiss société anonyme, which is an indirect wholly-owned subsidiary of Banco Santander, S.A., a Spanish banking association ("Santander"). OIS also acted as a service provider to OSUS, having been appointed its investment manager. Other service providers included HSBC Institutional Trust Services (Ireland) Limited (HSBC Custodian), HSBC Securities (Ireland) Limited (HSBC Administrator), PricewaterhouseCoopers Ireland, and KB Associates. Substantially all of OSUS's assets were invested with an account at BLMIS.
Following the December 2008 collapse of BLMIS, Irving Picard was appointed the trustee of BLMIS's liquidation. The trustee demanded that OSUS return more than $151 million that it had redeemed out of its BLMIS account within the 90-day preference period. On May 22, 2009, OSUS settled the trustee's preference claim by agreeing to turn over 85% of the amount demanded in return for the trustee allowing OSUS's claim against BLMIS in the amount of $1,540,141,277.60, reduced from $2.9 billion (the "Allowed Claim").
After the settlement of the preference action and allowance of its claim, OSUS began to receive interest from distressed debt investors in purchasing the Allowed Claim. At the same time, because it was apparent that it would take several years for the trustee to close the liquidation proceedings, some OSUS investors expressed an interest in liquidating their position in OSUS. In November 2010, the Bankruptcy Court issued an order providing that an allowed claim could be assigned to a third party, but only in its entirety. This meant that OSUS could not sell off portions of its $1.5 billion Allowed Claim. SPV was created to bypass the Bankruptcy Court's order that a claim could only be assigned in its entirety.
On May 5, 2011, SPV was established as a "special purpose vehicle" under Bahamian law,[FN1]
whereby investors in OSUS could convert their OSUS shares into shares of SPV, which the investors could either hold or sell. The transaction involved several steps. First, the entire Allowed Claim was assigned to SPV, in consideration of which OSUS received all of SPV's shares and SPV became a 100% subsidiary of OSUS. The directors of OML (who were the same directors of OSUS) comprised the initial board of directors of SPV. 
Second, OSUS shareholders wishing to dispose of their interests in the Allowed Claim would redeem their OSUS shares in return for shares in SPV, representing the investor's pro rata share of the allowed claim. Upon completing the transaction, the former OSUS shareholders, now SPV shareholders, owned their pro rata share of the allowed claim as personal property (in the form of SPV shares), and were free to either keep the shares or sell them to third-party investors at auction.
On May 6, 2011, concurrent with the creation of SPV, the parties executed the Assignment of Claim, pursuant to which OSUS assigned to SPV the Allowed Claim and certain other rights. Section 1 of the Assignment of Claim defines the rights transferred [*3]thereunder, and provides, in pertinent part, that OSUS assigned to SPV:
"(a) an undivided 100% interest (the "Purchased Claim") in Assignor's right, title, and interest in and to the allowed claim filed by Assignor (the "Proof of Claim") in the proceedings under the Securities Investor Protection Act of 1970 in the United States Bankruptcy Court for the Southern District of New York, (the "Court"), concerning Bernard L. Madoff Investment Securities, LLC (in liquidation) ("Debtor"), Case No. 08-01789 (BRL) (the "Proceedings"),
(b) all rights and benefits of Assignor related to the Purchased Claim, including (i) any right to receive cash, securities, instruments, interest, penalties, fees or other property that may be paid or distributed with respect to the Purchased Claim, (ii) any action or claim (including any 'claim' as defined in 11 U.S.C. § 101 (5)) of any nature whatsoever, whether against the Debtor or any other party, arising out of or in connection with the Purchased Claim, (iii) voting rights, but only to the extent related to the Purchased Claim,
(c) all rights of Assignor under paragraph 13 of the [May 22, 2009 settlement agreement with the trustee],
(d) any other rights, action or claim arising out of the Assignor's investment in Debtor including, but not limited to, any claim the Assignor may have with respect to any current or future victim remission proceedings developed by the United States Department of Justice and
(e) any and all proceeds of any of the foregoing (collectively, as described in clauses (a), (b), (c), (d) and (e) the "Transferred Rights")."
(Cmplt., Ex. A [emphasis in original]).[FN2]
Attached to the Assignment of Claim as Schedule 1 is a document entitled "Transfer of Allowed Claim" that was to be filed with the trustee. This form attaches a one-page document, also entitled "Assignment," which provides, in pertinent part, that SPV was assigned the Allowed Claim "together with any affirmative claims of the Assignor against third parties" (id.). Section 2.1 of the Assignment of Claim refers to these two documents as the "Transfer Form." However, Section 2.1 also states that "[n]othing in the Transfer Form shall supersede or alter the transactions contemplated by or the rights created under this Assignment" (id.).
On May 11, 2011, OIS organized, on OML's behalf, an auction for those interested in selling their SPV shares. The shares were sold to third-party hedge funds and distressed debt investors not affiliated with OSUS or OML. Two subsequent auctions were held in May of 2012 and 2013, respectively, at which point in time, the hedge funds and distressed debt investors held more than 93% of the shares of SPV. On June 30, 2014, the investor entities voted in a new SPV board of directors unaffiliated with OSUS, [*4]and changed the name of SPV to SPV OSUS Ltd. The new board of directors immediately began to investigate the third parties who had administered OSUS, maintained custody of its assets, and managed its investments.
In the fall of 2014, OSUS was advised that SPV's new board was evaluating its rights, claims and causes of action against third parties conveyed by the Assignment of Claim. In connection therewith, SPV sought documents concerning the agreements and engagement letters between OSUS and its third-party service providers. OSUS refused SPV's request for documents by letter dated November 4, 2014, contending that any claims OSUS might have had against its third-party service providers were not included in the Assignment of Claim's Transferred Rights. OSUS argued that claims against the third-party service providers do not arise "out of or in connection with the Purchased Claim" (quoting section 1 [b] of the Assignment of Claim) or "out of the Assignor's investment in Debtor" (quoting section 1 [d]). OSUS then commenced this action seeking a declaration that claims against any of OSUS's third-party service providers were not transferred to SPV under the Assignment of Claim.
On December 5, 2014, SPV initiated a lawsuit in the Irish High Court, Commercial against HSBC Custodian, HSBC Administrator, OIS, and Santander. In that proceeding, SPV claimed that the defendants were guilty of breaches of contract, misrepresentation, negligence, and breaches of fiduciary duty in relation to the services they performed for OSUS. 
On October 5, 2015, the Irish High Court dismissed the case as being "frivolous and vexatious and bound to fail" (Regan aff., Ex. B, ¶ 95). The Irish High Court did not consider whether the right to bring the litigation had been assigned to SPV, noting that issue, governed by New York law, would be determined in this present action (id., ¶¶ 24-25, 58, 71). However, the Irish High Court concluded that even if SPV had standing as the assignee under the Assignment of Claim, the assignment was void under the laws of champerty in Ireland (id., ¶¶ 88-95). SPV has appealed that ruling to the Irish Court of Appeal (see Cox 12/21/15 affirmation, Ex. 6). A similar lawsuit against HSBC Custodian, HSBC Administrator, OIS, and Santander has been commenced in The Commonwealth of the Bahamas (see Mem. of Law in Supp. of Pls. Motion for Summary Judgment, at 1, n 1).
On December 11, 2014, SPV commenced a second litigation in this court entitled SPV OSUS Ltd. v HSBC Holdings PLC, et al., Index 162259/2014 (Oing, J.) ("the HSBC Action"). A third litigation commenced on the same date, entitled SPV OSUS Ltd. v UBS AG, et al., Index 162262/2014 ("the UBS Action"), was removed to the Southern District of New York on January 28, 2015. In both the HSBC Action and the UBS Action, SPV asserts common-law claims against various third parties for aiding and abetting Madoff's fraud, and thus causing the loss of OSUS's entire investment in BLMIS.
SPV filed its answer to the complaint in this action on January 27, 2015, and asserted five counterclaims. In the first counterclaim SPV alleges that OSUS breached the Assignment of Claim by refusing to acknowledge that the Transferred Rights allow [*5]SPV to pursue claims against third parties, such as OSUS's third-party service providers; by withholding documents; and, by instituting the present declaratory judgment action. In the remaining counterclaims SPV alleges that OSUS has breached the covenant of good faith and fair dealing (second), breached express warranties in the Assignment of Claim (third), committed fraud (fourth), and made negligent misrepresentations (fifth). SPV seeks an award of compensatory damages, and, with respect to the first counterclaim, the remedy of specific performance and injunctive relief. On May 13, 2015, I dismissed, without prejudice, all but the first counterclaim for breach of contract.
Discussion
The Assignment of Claim provides that it is to be governed by, and construed in accordance with, the substantive laws of New York. In New York, "when parties set down their agreement in a clear, complete document, their writing should be enforced according to its terms." Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 (2004) (internal quotation marks and citation omitted). "It is the role of the courts to enforce the agreement made by the parties—not to add, excise or distort the meaning of the terms they chose to include, thereby creating a new contract under the guise of construction." NML Capital v Republic of Argentina, 17 NY3d 250, 259-260 (2011), citing Reiss v Financial Performance Corp., 97 NY2d 195, 199 (2001).
Courts may not create ambiguities in otherwise unambiguous contractual language by viewing it in the context of extrinsic evidence. Cornhusker Farms v Hunts Point Coop. Mkt., 2 AD3d 201, 204 (1st Dept 2003). "Evidence outside the four corners of the document as to what was really intended but unstated or misstated is generally inadmissible to add to or vary the writing." W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 (1990); see also National Union Fire Ins. Co. of Pittsburgh, PA v Greenwich Ins. Co., 103 AD3d 473, 474 (1st Dept 2013. "Adherence to these principles is particularly appropriate in a case like this involving interpretation of documents drafted by sophisticated, counseled parties and involving . . . substantial sums of money." NML Capital, 17 NY3d at 260; see also Chimart Assoc. v Paul, 66 NY2d 570, 574 (1986).
OSUS argues that, in interpreting the language of the Assignment, I must also consider the other documents created at the time of SPV's creation in 2011, specifically SPV's Memorandum of Association and the Informational Circular distributed to potential purchasers of SPV's shares. Under New York law, multiple agreements may be read as one contract only if the parties so intended. Rudman v Cowles Communications, 30 NY2d 1, 13 (1972). Here, the Assignment of Claim is a complete and integrated contract which does not incorporate these other documents, and each document serves a different purpose. Arciniaga v General Motors Corp., 460 F3d 231, 237 (2d Cir), cert denied 549 US 1097 (2006). Like all extrinsic evidence, including prior drafts of the Assignment, emails, letters, contemporaneous memoranda, and deposition testimony of the people involved in the drafting process, these documents may only be considered if the court finds the language of the Assignment of Claim to be ambiguous. Both sides argue that it is not, and I agree.
Under New York law, absent language demonstrating an intent to do so, tort claims do not automatically pass to an assignee. Fox v Hirschfeld, 157 App Div 364, 368 (1st Dept 1913); see also Banque Arabe et Internationale D'Investissement v Maryland Natl. Bank, 57 F3d 146, 151 (2d Cir 1995) ("Under New York law, the assignment of the right to assert contract claims does not automatically entail the right to assert tort claims arising from that contract").
There must be some demonstrated and direct intent to assign claims sounding in tort in an assignment, but New York law does not require any specific language to accomplish the transfer of tort causes of action. Rather, words are sufficient which show an intention of transferring such rights. Commonwealth of Pennsylvania Pub. Sch. Employees' Retirement Sys. v Morgan Stanley & Co., Inc., 25 NY3d 543, 550 (2015); see also Banque Arabe, 57 F3d at 151—152. 
The Banque Arabe court specifically held that the phrase "all of [the assignor's] rights, title and interest" in a loan participation agreement was not demonstrative of an intent to assign a claim against the lead lender for rescission of that agreement based on fraud claims, concluding that "this reference to the contract may be deemed insufficient under Fox to transfer claims for rescission or fraud in the inducement (id. at 152). Nevertheless, the Banque Arabe court did conclude there was a valid assignment of fraud claims as a result of broader language elsewhere in the assignment. There was also a transfer of all of the assignor's rights and interest in the loan transaction, which was construed to be broader than an interest in the contract and, thus, sufficient to effect the assignment of tort claims based on fraud.
The Assignment at issue in this case, like the assignment in the Banque Arabe case, does much more than assign to SPV all of OSUS's "rights, title and interest in and to the" Allowed Claim. Section 1 (b) of the Assignment also transferred to SPV "all rights and benefits of Assignor related to the Purchased Claim, including . . . (ii) any action or claim . . . of any nature whatsoever, whether against the Debtor or any other party, arising out of or in connection with the Purchased Claim" (emphasis added). This language plainly includes third-party tort claims, so long as the claims arise out of, or are in connection with, the Allowed Claim. 
OSUS argues that claims against its service providers do not arise "out of or in connection with the Purchased Claim," but arise out of the contracts between OSUS and those service providers and have nothing to do with the liquidation of BLMIS. SPV disagrees, contending that the Seventh Circuit has interpreted an assignment of a bankruptcy claim with language substantially similar to that of section 1 (b), as encompassing a contract-based claim that was "connected to the [transferred] general unsecured claim through the original provision of services from which the default arose." Matter of UAL Corp., 635 F3d 312, 317 (7th Cir 2001).
Matter of UAL Corp. actually disproves SPV's argument. The issue in that case was whether an assignment to a claims trader of AT & T's pre-petition unsecured claim for $4.9 million against bankrupt United Air Lines, Inc. (UAL), also included the right to [*6]file a "cure claim" in the bankruptcy proceeding to collect the full amount of the debt.[FN3]
The assignment agreement defined the claim being assigned as:
"any general pre-petition unsecured claim of AT & T against a debtor together with interest, if any, payable thereon from and after the Effective Date, and any actions, claims, lawsuits or rights of any nature whatsoever, whether against a debtor or any other party, arising out of or in connection with the Claim, including, Assignor's right to receive, from and after the Effective Date, any cash, securities, instruments, and/or other property as distributions on the Claim"
Id. at 316 (emphases in original). The Seventh Circuit ruled that the claims trader "received not only the general unsecured claim but also any actions, claims, lawsuits or rights 'arising out of or in connection with' that claim" (id. at 317), which included the cure claim, because both it and the general unsecured claim "stem from the same transaction giving rise to a single right of payment" within the bankruptcy proceeding. Id.
The Seventh Circuit did not, as SPV contends, rule that the language of the assignment included the right to commence litigation against third parties who were in some way connected with AT & T's contractual relationship with UAL, and who may have contributed to the loss suffered by AT & T as a result of UAL's bankruptcy filing, i.e., the right to pursue a separate payout unconnected with the bankruptcy proceeding. I agree with OSUS that section 1 (b) of the Assignment does not encompass the third-party service provider claims, as they are unrelated to the liquidation proceeding. 
SPV also argues that these litigations represent potential sources for recovery of the full value of the Allowed Claim, which may not ever be fully satisfied from the BLMIS estate. But nothing in the Statement of Claim filed in the Irish High Court limits SPV's damages to the shortfall between the $1.5 billion allowed claim and the ultimate payout from the trustee (see Regan affirmation, Ex. A, ¶¶ 1, 8, and at 46).
Although section 1 (b) of the Assignment is not broad enough to encompass any underlying contract or tort claims that OSUS may have had against third parties arising out of its investment in BLMIS, section 1 (d) of the Assignment contains broader language. Under this subsection, coupled with the language of the Transfer Form, SPV received "any rights, action or claim arising out of" OSUS's underlying investment with BLMIS. This language is similar to the assignment at issue in Banque Arabe.
OSUS argues that section 1 (d) only applies to claims arising out of OSUS's account relationship with BLMIS, and that the third-party service provider claims arise [*7]out of separate contractual relationships between OSUS and those service providers. But section 1 (d) does not use the words account relationship between OSUS and BLMIS; rather, the language reads "arising out of the Assignor's investment in Debtor," which is a broader phrase encompassing all aspects of OSUS's investment in BLMIS. OSUS may not create ambiguities in the Assignment by "straining the contract language beyond its reasonable and ordinary meaning." Bethlehem Steel Co., 2 NY2d at 459. The words "arising out of" must be afforded their common or ordinary understanding, namely, to mean "'originating from, incident to, or having connection with.'" Maroney v New York Cent. Mut. Fire Ins. Co., 5 NY3d 467, 472 (2005), quoting Aetna Cas. & Sur. Co. v Liberty Mut. Ins. Co., 91 AD2d 317, 320—321 (4th Dept 1983); see also Northern Assur. Co. of Am. v EDP Floors, Inc., 533 A2d 682, 688 (Md 1987) (phrase "arising out of" means "originating from, growing out of, flowing from, or the like"). Thus, section 1 (d) of the Assignment, coupled with the language of the Transfer Form, includes any rights or claims originating from or growing out of OSUS's investment in BLMIS, which include the claims asserted against OSUS's third-party service providers.
OSUS admits that SPV was assigned the right to sue certain third parties for aiding and abetting BLMIS's fraud and breach of fiduciary duty, and does not contest SPV's right to commence either the HSBC Action or the UBS Action [FN4]
(see May 26, 2016 Tr. of Oral Argument [NYSCEF Doc. 106] at 15; Mem. of Law in Opp. to Def.'s Motion for Summary Judgment, at 10, n 4). The fact that these aiding and abetting claims inure to the benefit of all investors in BLMIS, akin to the MVF, and not just to OSUS/SPV, is a distinction without a difference. Section 1 (d) of the Assignment cannot be read to include the common-law aiding and abetting claims against non-Santander companies, but not the tort and contract claims against those companies that were directly responsible for OSUS's investment in BLMIS.[FN5]

OSUS argues that because it has contractual indemnification obligations to its third-party service providers, it would not have agreed to assign to SPV the right to sue these companies. However, no third-party servicer litigation holdback was included in the broad claim assignment language of the Assignment, and the evidence shows that potential claims against the third-party service providers were identified early on as [*8]having some potential value to OSUS's investors.
For these reasons, I conclude that potential litigation claims against OSUS's third-party service providers for any acts or omissions in connection with OSUS's investment in BLMIS are included within the Assignment's definition of Transferred Rights in section 1 (d) of the Assignment and the language of the attached Transfer Form. I therefore award partial summary judgment to SPV on its first counterclaim.[FN6]

Conclusion, Order & Judgment
For the foregoing reasons, it is hereby
ORDERED that plaintiff's motion for summary judgment (seq. no. 007) is denied; and it is further
ORDERED that defendant's motion (seq. no. 008) for summary judgment is granted, the complaint is dismissed, and defendant is awarded summary judgment as to liability on its first counterclaim for breach of the Assignment; and it is further
ORDERED, ADJUDGED and DECLARED that the rights included within the definition of "Transferred Rights" in the Assignment includes litigation claims against OSUS's service providers that arise out of OSUS's investment in BLMIS, such as the claims that SPV has asserted in the Irish High Court Proceeding; and it is further
ORDERED that SPV's claim for damages for breach of the Assignment is severed and continued.
Dated: March 6, 2017
ENTER:
____________________________________
J.S.C.



Footnotes

Footnote 1:At its creation, SPV was named SPV Optimal SUS Ltd.

Footnote 2:Although the actual Assignment Claim itself does not break down subsections (a) through (e) into separate paragraphs, I do so now to clearly delineate each subsection.


Footnote 3:A "cure claim" arises when a debtor assumes an executory contract during its bankruptcy. The counterparty to the contract being assumed is entitled to a cure of all defaults thereunder, which must be paid in full as a condition to assumption of the contract, effectively creating priority status for debts arising from assumed contracts (see 11 USC § 365 [b] [1]).

Footnote 4:OSUS also does not object to SPV recovering monetary compensation in a class action lawsuit brought against BLMIS's bank by two BLMIS customers on behalf of all other similarly situated BLMIS customers. See Shapiro v J.P. Morgan Chase & Co., et al., No. 11-Civ-08331 [CM] (SDNY).


Footnote 5:The fact that section 1 (d) of the Assignment specifically identifies the Department of Justice's Madoff Victim Fund as one of the assigned claims does not limit section 1 (d), because the preceding language indicates that that the Assignment "include[es], but [is] not limited to" claims against the Department of Justice's Madoff Victim Fund.


Footnote 6:Although SPV also seeks an award of monetary damages for breach of the Agreement in the first counterclaim, it seeks only declaratory relief on this motion.